THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JUAN RAMÓN GONZÁLEZ, Defendant and Appellant.

No. 9544. Argued January 14, 1943.—Decided February 2, 1943.

*Edgar S. Belaval* for defendant. *R. A. Gómez, Prosecuting Attorney (Fiscal),* and *Luis Negrón Fernández, Assistant Prosecuting Attorney,* for appellee.

MR. JUSTICE SNYDER delivered the opinion of the court.

The defendant, after waiving trial by jury, was convicted by the district court of murder in the second degree and sentenced to thirty-years' imprisonment. He has appealed, assigning three errors.

Juan Santa had been in the employ of José Ruidíaz, a storekeeper, for ten years. Ruidíaz lived in the rear of his store. Whenever he left the store, Santa watched it for him. This store was located near the factory of the Loíza Sugar Co., about 100 meters from the Central.

On October 9, 1938, a Sunday, Ruidíaz left his store about one in the afternoon and came to San Juan. He left the store and his house locked, and Santa remained therein to watch it until Ruidíaz's return. When he returned about 11 or 11:30 at night, he found Santa lying on the floor in an unconscious condition. The locks on the door at the back of the store and on his bureau had been forced, and approx-imately $270 stolen from the bureau. It was established that Santa received four different wounds, and that he had died from a fracture of the skull about 8:15 or 9:15.

The district attorney filed a single information charging Juan Ramón González, José Alberto Muriel, and Mariano Rosario Centeno jointly with the murder of Santa, but González was tried separately in the case now before us on appeal.

González lived in the quarters of the Loíza Sugar Co., situated near the scene of the crime. Félix Santiago testified that on the night of the killing, which was a bright moonlit night, he was leading a cow past Ruidíaz's store about 7:30 to 8:00 p.m.; that he saw the defendant and Mariano Rosario Centeno struggling with Santa; and that a short distance away he saw Muriel, who was bending forward as though he was trying to grab something, and looking towards Santa.

Two witnesses testified that about 7:30 they saw Muriel, who asked them where González was, and that Muriel asked one of the witnesses to take him to the quarters of the Central, telling him that if he could find González for him he would be rewarded. Another witness testified that about 7 P. M. that same night Muriel asked him for González's whereabouts; that he told Muriel he did not know; that a few minutes later he saw González, and told him Muriel was looking for him, and that he informed Muriel of this on seeing him for a second time.

Co-defendants Muriel and Mariano Rosario Centeno lived together in the quarters of the Central. A public chauffeur who operated on the route between Canóvanas and the Central, a trip which took only 5 minutes, testified that he took González and Muriel from town to the Central between 8 and 9 o'clock on the night of the killing. Another witness testified that he saw the defendant between 8 and 9 of that same night, running from the direction in which the house of Ruidíaz was located, and that he then proceeded to board an automobile going towards Canóvanas. A policeman testified that about midnight he found the defendant in the "batey" of the Central, squatting on the floor and eating a grapefruit; and that when he heard that Santa had been killed, he dropped the grapefruit and told the policeman that a man by the name of Muriel, a dangerous character, had been looking for the defendant that evening.

While the proof was not as rebust as it might have been, there was sufficient direct and circumstantial evidence to justify the conviction of the defendant. The district court, in refusing to give credence to the testimony of the defendant, by which he attempted to establish an alibi, was acting within its province. *People* v. *Berenguer,* 59 P.R.R. 79, 90.

■ There was no error in admitting as testimony against the defendant the acts and statements of Muriel, his co-defendant, in connection with Muriel's efforts to locate the defendant on the night of the crime, since the information charged that the defendant, Muriel, and another person committed the crime in question jointly. *People* v. *Escobar,* 55 P.R.R. 491, 508; *People* v. *Berenguer, supra,* at page 88.

The defendant objected to the introduction of this testimony at the trial on the ground that it could not be admitted unless Muriel's connection with the murder was first shown. No such requirement exists as a matter of law. "The logical sequence of events—from agreement in a common purpose to perpetration of an act designed to carry it out—does not

require that introduction of the evidence must follow the same rigorous sequence." (*McDonald* v. *United States*, 133 F. (2d) 23, (C. A., D. C. 1942). "Generally speaking the order in which evidence shall be presented to a jury is controlled by the trial judge. If he receives evidence out of its logical order it may become necessary, later, for him to strike it from the record and instruct the jury to disregard it; or perhaps to declare a mistrial. But if sufficient evidence is presented by the Government, before it closes its case, to show the relevance, materiality, or other factor of admissibility of the challenged evidence, then no prejudice results to the accused." · (*Ercoli* v. *United States*, 131 F. (2d) 354, 355, C. A., D. C. 1942).

As a matter of fact, in this particular case, Muriel had already been connected with the crime by the above-noted testimony of Santiago before Muriel's acts and statements were offered in evidence against the defendant.

█ Finally, the defendant complains of the action of the trial judge in calling on his own initiative two witnesses to testify after both sides had rested. Only one of these actually testified. In ruling on a motion to strike his testimony the lower court said:

"The court is of the opinion that it has authority to summon any witness whose testimony the court believes might help in deciding a case. In this case the testimony of Félix Santiago is essential and it is very important for the court to determine whether or not Santiago spoke the truth. In Santiago's own testimony there was a gap which the court was unable to understand, that is, how was it ascertained that Santiago knew something. The court was concerned about that and believed it convenient to summon the person who according to the evidence had ordered Santiago's arrest in order to learn why had Santiago been arrested; how was it ascertained that Santiago knew something concerning this case; . . . . · The court called the witness who had not been presented by any of the parties in order that he explain that situation, and it does not constitute rebuttal of defendant's evidence nor does it constitute evidence of The People or of the defense; it is simply evidence to explain a situation."

The court's ruling was not only eminently proper, but its action in insisting on hearing the justice of peace who ordered the arrest of the witness was praiseworthy. After the parties have been given full opportunity to adduce all the facts and have failed to do so, a trial judge is justified in calling *sua sponte* witnesses who may shed light on any of the material facts in issue. (See *People* v. *Alvarado,* 55 P. R.R. 24, 27; *People* v. *Quiles,* 41 P.R.R. 904, 10; Annotation in 84 A.L.R. 1172). The testimony of the justice of peace cleared up the question of how it was discovered that Santiago knew something about the facts of this case, and why he had not testified—"because he was afraid" of the defendant—on the first day of the investigation.

The judgment of the district court will be affirmed.